AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
для the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Grey Sky Devices tablet<br>Seized as FP&F No. 2025565600000901<br>(Target Device 2) | ) ) ) ) ) ) ) Case No. '24 MJ3754 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Jason Larson, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days *(give exact ending date if more than 30 days:* ___ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

U.S. Border Patrol Agent Jason Larson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 11/12/2024

*Judge's signature*

City and state: San Diego, California     HON. DAVID D. LESHNER, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

Grey Sky Devices tablet
Seized as FP&F No. 2025565600000901
(Target Device 2)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the electronic devices described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **October 22, 2024, through November 5, 2024**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Jason Larson, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Black Samsung cellphone
> Seized as FP&F No. 2025565600000901
> ("**Target Device 1**")
>
> Grey Sky Devices tablet
> Seized as FP&F No. 2025565600000901
> ("**Target Device 2**")

Collectively, the **Target Devices**, as further described in Attachments A-1 and A-2 to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrants related to the investigation and prosecution of Daniel Alonso GUERRERO Robles and Salvador CAMACHO Martinez, for transporting and moving illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2011 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 13 years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On November 5, 2024, Supervisory Border Patrol Agents G. Davis and Supervisory Border Patrol Agent B. Schwartz were conducting assigned duties in the Campo Border Patrol Station's area of responsibility. Agent Davis was dressed in plain clothes, with his agency issued ballistic vest and agency patches and insignias visible. Agent Schwartz was wearing his full rough duty uniform with agency patches and insignias visible.

12. At approximately 2:35 PM, Border Patrol Agent D. Ledezma was parked in an area known to Border Patrol Agents as "Da Wash," when she observed a black four door Acura traveling east on Old Highway-80 (OH-80). After the Acura passed her location, Agent Ledezma observed the Acura turn north onto Heber Street. Agent Ledezma did not recognize the Acura as a local of Jacumba and decided to run record checks on the vehicle. The Acura came back registered to Eloy A. Zavala Camacho or Salvador M. Camacho, out of Escondido, California and no Border Patrol Checkpoint crossings. Agent Ledezma then informed other agents about the Acura. At approximately 2:38 PM, Agent Ledezma observe the Acura turned back east onto OH-80, from Campo Street, and leave Jacumba. Agent Ledezma then informed other agents of the Acura in the Jacumba area.

13. At approximately 2:40 PM, Border Patrol Agent Mejia was at the intersection of Carrizo Gorge Rd. and OH-80, when he observed the Acura pass his location. Agent Mejia started to follow the Acura attempting to catch up to it. Agent Mejia then informed Border Patrol Agent O. Ortiz, who was positioned in between the Chevron and Shell gas stations off the Jacumba Hot Springs exit of the Interstate-8 (I-8), that the Acura was headed towards him. At approximately 2:43 PM, Agent Ortiz observed the Acura turn

north onto the I-8 westbound on ramp. Agent Ortiz then started to follow the Acura, alongside Agent Mejia.

14. Both Agent Mejia and Agent Ortiz thought it was odd that the Acura, which was initially observed traveling east, would now be traveling west on the I-8. Agent Ortiz and Agent Mejia were highly suspicious of the Acura due to its travel pattern. As Agent Ortiz and Agent Mejia followed the Acura west on the I-8, they observed some erratic driving behavior from the Acura. The Acura drop its speed to approximately 60 MPH when he noticed the agents, they observed the Acura ride the solid right shoulder line, and they observed the Acura swerve onto the adjacent lane. At approximately 2:47 PM, once the Acura passed through Walker Canyon, Agent Ortiz and Agent Mejia activated their emergency lights and attempted a vehicle stop on the Acura.

15. At approximately 2:48 PM, the Acura pulled to the right shoulder of the I-8 and slowed down to yield however, the Acura sedan aggressively accelerated and jerked over both lanes into the #1 lane. Once it was apparent that the black Acura sedan was not yielding, Agent Mejia informed other agents and dispatch that they were engaged in a pursuit with the Acura that failed to yield (FTY). Agent Mejia advised that the speeds initially were 90 miles per hour, with light traffic and dry road conditions. The black Acura sedan showed no signs of slowing down and was continuing to accelerate at extreme speeds as it continued to FTY at 107 MPH.

16. At approximately 2:50 PM, Supervisory Border Patrol Agent Petersen informed Agent Mejia and Agent Ortiz to terminate pursuit. Agent Ortiz and Agent Mejia immediately, deactivated emergency lights and pulled along the right shoulder of the I-8, approximately one mile west of the Ribbonwood Road exit. At approximately 2:51 PM, Agent Petersen informed dispatch to notify Campo Border Patrol Agents to be on the lookout for the black Acura sedan.

17. At approximately 2:55 PM, Agent Davis observed the Acura drive west past his location on the I-8, at Kitchen Creek Road. Agent Davis advised informed dispatch

and other agents that he was trying to catch up to the Acura, which was still traveling at a high rate of speed.

18. Border Patrol Agent F. Gamez was positioned west of the Kitchen Creek Road exit on a set of bridges known to Border Patrol Agents as the Kitchen Creek Bridges. Agent Gamez obtained visual of the Acura after it passed Agent Davis' location and noticed that there were no civilian vehicles around it as it was still traveling at a high rate of speed. With no civilian vehicles nearby Agent Gamez found it safe to deploy a Vehicular Immobilization Device (VID) to stop the Acura safely. Agent Gamez deployed the VID safely and observed the Acura go over it as the tires began to deflate. Agent Gamez then safely retracted the VID making the roadway clear and safe for the public to driving.

19. At approximately 2:57 PM, Agent Davis was able to catch up to the black Acura sedan, just east of the Buckman Springs Road exit of the I-8, as it was coming to a stop. At approximately 2:58 PM, after catching up to the Acura east of the Buckman Springs Rd I-8 exit, Agent Davis observed four individuals exit the Acura and run north into some thick brush. Agent Davis observed two individuals wearing all black clothing and one wearing a green baseball hat.

20. Supervisory Border Patrol Agent B. Schwartz arrived on scene and began searching the area for the other two individuals. Agent Schwartz discovered some footprints and began to follow them for approximately four minutes until he encountered one individual, later identified defendant, Daniel Alonso GUERRERO Robles, hiding in thick brush. At approximately 3:05 PM, Agent Schwartz arrested GUERRERO. Agent Schwartz continued his search and encountered a second individual, later identified as defendant, Salvador CAMACHO Martinez, hiding in the dense brush. At approximately 3:11 PM, Agent Schwartz placed CAMACHO under arrest. This area is approximately eleven miles north of the United States/Mexico International Boundary and approximately nine miles east of the Tecate, California Port of Entry.

21. At the time of arrest, a Black Samsung cellphone (Target Device 1) and a Grey Sky Devices tablet (Target Device 2) were found on CAMACHO Martinez's person. Both devices were claimed by CAMACHO Martinez and were subsequently seized.

22. After first securing the Acura, Agent Davis began to walk towards the area where he saw the individuals run into the thick brush. Agent Davis followed a main trail northwest for a few minutes and then encountered two individuals hiding in dense brush.

23. Agent Davis conducted an immigration inspection on both individuals. Both individuals, later identified as material witnesses, Yulian Andres TEJADA Corrales and M. D. S. R. (Juvenile), stated that they are citizens and nationals of Costa Rica without any immigration documents that would allow them to enter or remain in the United States legally.

24. At approximately 3:37 PM, Agent Davis placed TEJADA and M. D. S. R. (Juvenile) under arrest. This area is approximately eleven miles north of the United States/Mexico International Boundary and approximately nine miles east of the Tecate, California Port of Entry.

25. CAMACHO stated that he was approached by defendant GUERRERO and offered to split profits from transporting undocumented non-citizens. CAMACHO stated that they used his vehicle and drove from Escondido California to Jacumba. He stated that GUERRERO was the person in constant contact with the smugglers. CAMACHO stated that GUERRERO was given an address in the town of Jacumba. As they arrived GUERRERO yelled out a female name, shortly after two individuals ran out from behind a dumpster. The two individuals ran into the vehicle and were told to lay down by CAMACHO. CAMACHO stated that GUERRERO was then given another address that was approximately three hours away. CAMACHO believed they were driving the individuals to Los Angeles, California. Shortly after they noticed Border Patrol Agents attempted to pull them over, CAMACHO stated that he told GUERRERO to pull over and

he did not listen to him. CAMACHO stated that Border Patrol Agents spiked their vehicle soon after and were arrested.

26. Material witnesses M.D.S.R. and Yulian Andres TEJADA Corrales stated that they are citizens of Costa Rica without any immigration documents that would allow them to enter or remain in the United States legally. M.D.S.R. stated that smuggling arrangements were made prior to crossing into the United States and stated that she was to pay $10,500 USD if successfully smuggled into the United States. TEJADA stated that M.D.S.R. made all his smuggling arrangements.

27. M.D.S.R. and TEJADA stated that they crossed on November 5, 2024. M.D.S.R. stated that they were instructed to run north across a highway and parallel train tracks. M.D.S.R. stated that after approximately three hours they were told by the smuggler that a black Acura would arrive and yell their names. After a few minutes the vehicle arrived and did yell their names. Both individuals ran into the vehicle and were told to lay down and not look at them. After the vehicle left the area the driver drove at a high rate of speed and eventually stopped. Both material witnesses stated they stayed inside the vehicle and were arrested.

28. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer

than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **October 22, 2024, through November 5, 2024.**

## METHODOLOGY

29. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

30. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will

employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

31. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

32. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//

//

//

//

//

//

//

## CONCLUSION

33. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

34. Because the **Target Devices** were seized at the time of defendant's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **October 22, 2024, through November 5, 2024.**

35. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Jason Larson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of November 2024.

HON. DAVID D. LESHNER
United States Magistrate Judge